UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
:
UNITED STATES OF AMERICA,                     :
:
Plaintiff,                   :          **MEMORANDUM AND ORDER**
:
- against -                       :          09-cr-0581 (ENV)
:
JOSEPH MARK DELEVANTE PETERS,                 :
:
Defendant.                   :
:
---------------------------------------------------------------X

**VITALIANO, D.J.**

On August 18, 2009, defendant Joseph Mark Delevante Peters was indicted for the crime

of illegal reentry into the United States subsequent to deportation for conviction of an aggravated

felony. Defendant moves for dismissal of the indictment with prejudice, pursuant to Federal

Rule of Criminal Procedure 12(b)(2) and the Fifth Amendment, on the ground that the

deportation order enforced against him was invalid since it resulted from deportation proceedings

that were fundamentally unfair. For the reasons stated below, the Court grants defendant's

motion to dismiss.

## I.  FACTS

Peters was born in Jamaica, the West Indies on January 9, 1961. In December 1981, he

and his sister Philomena entered the United States as lawful permanent residents, to join their

mother, their brother Gareth, and their sister Margaret. During his time in the United States,

Peters attended Apex Technical School, where he studied auto mechanics, and later worked at

local businesses in New York and New Jersey.

On the other side of the ledger, Peters was convicted on April 16, 1987 in Supreme

Court, Queens County of criminal sale of a controlled substance in the fifth degree, in violation

1

of § 220.31 of the New York Penal Law. Peters was sentenced to a five-year term of probation. While on probation, Peters was arrested twice more (on December 4, 1987 and on October 2, 1988) for selling cocaine. He was convicted on March 20, 1989 in Queens Supreme Court of criminal sale of a controlled substance in the third degree and criminal sale of a controlled substance in the fifth degree, in violation of §§ 220.31 and 220.39 of the New York Penal Law. For these offenses, Peters was sentenced to two concurrent terms of imprisonment of two-to-four years. The court also revoked his probation and resentenced him to one-to-three years in prison, also to run concurrently. While incarcerated, however, Peters completed several programs, including a drug rehabilitation program and an "alternatives to violence" program, and received several certificates attesting to his success.

In November 1989, after Peters's release from state prison, and because of his three drug-sale convictions, the then-Immigration and Naturalization Service ("INS") initiated deportation proceedings against him. He was first represented by Irene Smith, who informed the immigration court that Peters was seeking relief under § 212(c)[1] of the Immigration and Naturalization Act ("INA"). She further informed the court that Peters's family members, as well as the Deputy Chief of Homicide in the Queens County District Attorney's office, would be prepared to testify on his behalf.

On November 8, 1990, Peters's completed an "Affidavit and Motion for Leave to Proceed In Forma Pauperis" ("IFP"), which was notarized by priest-advocate Father Robert Vitaglione, who is not an attorney. On April 17, 1991, defendant wrote a letter to the Legal Aid

---

[1] Former § 212(c) of the INA provided, in relevant part, "[a]liens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General." See former 8 U.S.C. § 1182(c). Courts interpreted the relief under § 212(c) as being available to any permanent resident who had been living in the United States for seven consecutive years and was facing possible deportation. See, e.g., Francis v. INS, 532 F.2d 268, 271 (2d Cir. 1976); Matter of Edwards, 20 I. & N. Dec. 191, 194 (BIA 1990). The well-trod legal strategy pursued by Peters was dubbed the "212 waiver" application.

Society seeking new representation for his deportation proceedings. Whether or not connected to this request, at the next proceeding, Peters was represented by someone named Collins. The proceeding was adjourned till June 12, 1991 because the INS was unprepared; the immigration judge ("IJ") told Peters's representative to have witnesses ready to testify at the next hearing.

Peters's representative appeared without him at the next return date and stated that the case was ripe, meaning that an I-191 form had been filed (apparently on February 22, 1991) and that the representative was in possession of his client's pre-sentence report, but made no mention of putting on witnesses. The hearing was adjourned till August 14, 1991.

Peters appeared at the August 14th hearing and was this time represented by Father Vitaglione. Father Vitaglione stated that he was seeking § 212(c) relief on Peters's behalf. The IJ advised that the I-191 form had been returned to Father Vitaglione because, apparently notwithstanding the IFP application, the filing fee had not been paid; the IJ told Peters to pay the fee and to provide supporting documentation for the 212 waiver application to Father Vitaglione. Father Vitaglione, it appears, failed to tell the IJ that Peters was indigent and had already completed the appropriate IFP documentation. He also failed to mention that there were witnesses waiting in the wings to testify on Peters's behalf.

On November 20, 1991, Peters appeared for another hearing date with Father Vitaglione, who requested another adjournment to submit the I-191 and supporting documentation. This time, Father Vitaglione requested the adjournment because Peters did not have the money for the filing fees (still neither paid not excused) and because Peters had failed to gather the supporting documentation. The IJ chastised Peters for his delinquency in providing the necessary documentation and adjourned the hearing till January 15, 1992. Again, Father Vitaglione made

no mention of either Peters's long-completed IFP request or of the presence of the witnesses prepared to testify on Peters's behalf.

It was at this point that the immigration proceedings truly began to unravel. Peters failed to appear for the January 15, 1992 hearing, having fallen ill from symptoms of a chronic peptic ulcer condition. His sister Margaret attempted to contact Father Vitaglione to tell him the news but could not reach him. Defendant was treated at a health center, released, and restricted to bed rest for the next two months. Meanwhile, making matters worse, another representative appeared at the hearing in Father Vitaglione's stead, which was, apparently, a not-uncommon occurrence. Notwithstanding the double absence, the IJ conducted the hearing anyway. Not surprisingly, the substitute representative presented no evidence and made no arguments. The IJ, noting that the I-191 had never been submitted, essentially deemed the 212 application defaulted. The IJ then ordered that Peters be deported in absentia. He gave the representative ten days to file a Notice of Appeal or, in the alternative, to file a motion to reopen the hearing and explain Peters's absence.

Neither the pinch-hitting representative nor Father Vitaglione ever contacted Peters (either by phone or mail) following the January 15, 1992 hearing and entry of the deportation order. Peters and his sister Margaret nonetheless attempted to get in touch with Father Vitaglione but were unsuccessful. Months later, however, Peters was told by someone in Father Vitaglione's office that he had been ordered deported and that there was nothing that Peters could do about it.

In October 1995, after he had come into their custody, Peters was released by the New York City Police Department into INS custody. On October 25, 1995, he filed, through counsel, a request for a stay of deportation and, on October 31, 1995, a motion to reopen his deportation

proceedings. Peters asserted that he had been unable to attend his hearing in 1992 because he had been seeking treatment for a peptic ulcer at a medical facility. The IJ granted Peters's request for a stay on October 27, 1995 and scheduled a hearing on the motion to reopen for November 1, 1995.

On November 22, 1995, the IJ denied the motion to reopen the deportation proceedings. Although he assumed that Peters had been "genuinely ill" on January 15, 1992, the IJ denied the motion as a matter of discretion because Peters "chose to forego any attempt to resolve his immigration situation and took no steps to do so until he was back in INS custody in 1995." (Government Exhibit 9 to Memorandum of law of the United States in Opposition to the Defendant's Motion for Dismissal of the Indictment Pursuant to 8 U.S.C. § 1326(d), at 5-6.) The IJ also did not credit the assertion that Peters had truly believed that his deportation case had been dismissed simply because he had not heard from his representative or the INS about it.

Peters was deported to Jamaica on November 25, 1995. He returned to the United States afterward and was arrested by the police in Brooklyn on June 30, 2009 for criminal sale of marijuana in the fourth degree, New York Penal Law § 221.40, and criminal possession of marijuana in the fifth degree, New York Penal Law § 221.10(1). Given his immigration status of record, there was cause to believe by his presence in Brooklyn, Peters had run afoul of 8 U.S.C. §§ 1326(a) and 1362(b)(2). He was subsequently detained by Immigration and Customs Enforcement authorities. This indictment followed.

## II. DISCUSSION

### A.    Collateral Attacks on Deportation Orders in Illegal Reentry Prosecutions

Title 8 U.S.C. § 1326(b)(2) makes it a crime for an alien who has been deported to enter, attempt to enter, or be found in the United States without the express consent of the Attorney

General if the deportation "was subsequent to a conviction for commission of an aggravated felony." However, because a prior deportation is a necessary element of the crime of illegal reentry, the Supreme Court has held that an alien can defend against such a criminal charge by challenging the validity of the deportation order upon which the charge is predicated. See United States v. Mendoza-Lopez, 481 U.S. 828, 837-39 (1987). In 8 U.S.C. § 1326(d), Congress codified the collateral attack remedy pioneered in Mendoza-Lopez. In sum, under § 1326(d), in order to collaterally challenge a deportation order, an alien is required to demonstrate the following:

> (1) exhaustion of administrative remedies;
>
> (2) that the deportation proceedings improperly deprived the alien of the opportunity for judicial review; and
>
> (3) that the entry of the removal order was fundamentally unfair.

A defendant charged with illegal reentry must establish all three prongs of 8 U.S.C. § 1326(d) to invalidate the predicate deportation order. United States v. Fernandez-Antonia, 278 F.3d 150, 157 (2d Cir. 2002).

## B.    Exhaustion of Administrative Remedies

Generally speaking, an alien fulfills the exhaustion requirement by having appealed the denial of a motion to reopen his deportation proceedings[2] to the BIA. See, e.g, United States v. Scott, 394 F.3d 111, 116-17 (2d Cir. 2005). Clearly, however, "failure to exhaust administrative remedies bars collateral review of a deportation proceeding under Section 1326(d)(1) . . . only where an alien's waiver of administrative review was knowing and intelligent." United States v. Sosa, 387 F.3d 131, 136 (2d Cir. 2004).

---

[2] Note that, under the regulations in place in 1992, a motion to reopen an in absentia deportation order was not subject to time limitations. See Matter of Cruz-Garcia, 22 I. & N. Dec. 1155, 1157-59 (B.I.A. 1999). Thus, Peters was not untimely under the regulations in waiting to file his motion.

6

In that light, the Court finds that Peters's failure to appeal to the BIA and, consequently, to exhaust his administrative remedies, should be excused, and, does not bar collateral review. To begin, under 8 C.F.R. § 242.19 (1995), "[a] written decision shall be served upon the respondent and the trial attorney, together with the notice referred to in § 3.3 of this chapter. Service by mail is complete upon mailing."[3] Here, there is no evidence that Peters (or his attorney or any other representative) was served with a copy of the decision or a notice of his right to appeal.[4] This defect in the provision of notice is not just important as a matter of procedure, it is important because, for it to be effective, an alien must waive administrative review knowingly and intelligently. See, e.g., Mendoza-Lopez, 481 U.S. at 839-40 (holding that plaintiffs' due process rights were violated by the failure of the IJ to explain adequately their right to suspension of deportation or their right to appeal and stating, "[b]ecause the waivers of their rights to appeal were not considered or intelligent, respondents were deprived of judicial review of their deportation proceedings. The Government may not, therefore, rely on those orders as reliable proof of an element of a criminal offense."). If, because there is no evidence of service having been made, Peters did not know about the IJ's decision, he could not have knowingly and intelligently waived administrative review. To be sure, Peters was put on notice of at least the termination of the stay of proceedings when he was deported, but, in essence, by the time that he was aware that it was time to appeal, he was on an American Airlines flight to Jamaica.

In addition, the regulations in place in 1995 may have deprived Peters of the opportunity to exhaust administrative review anyway. Indeed, the former 8 C.F.R. § 3.3 may have taken away his right to appeal the IJ's decision. Peters acknowledges that he failed to appeal the

---

[3] A § 3.3 notice is a notice of appeal.

[4] See United States v. Fares, 978 F.2d 52, 56 (2d Cir. 1992) ("[A]n alien threatened with deportation [must] be given written notice that he has a right to appeal.").

November 22, 1995 denial order to the BIA, but notes that this failure occurred because he was deported on November 25, 1995, three days after the denial (and termination of the stay of proceedings) was signed by the IJ. He argues, to great effect, that, once he was physically deported, any appeal to the BIA would have been deemed waived. See 8 C.F.R. § 3.3 (1995) ("Departure from the United States of a person under deportation proceedings prior to the taking of an appeal from a decision in his case shall constitute a waiver of his right to appeal."). Though the regulations on the point have been revised over the years, little had changed substantially. See also BIA Practice Manual § 4.13(a) ("Departure from the United States can jeopardize an alien's right to appeal, even when the departure is authorized or compelled by the Department of Homeland Security.").

The Second Circuit has provided little guidance on the topic, either under former 8 C.F.R. § 3.3 or the current 8 C.F.R. § 1003.4. See Ahmad v. Gonzales, 204 F. App'x 98, 99 (2d Cir. 2006) ("It is unclear whether [8 C.F.R. § 1003.4] properly applies where an alien does not voluntarily depart but instead is deported."); cf. Copeland, 376 F.3d at 69 ("After deportation, further administrative and habeas review were precluded by a pre-IIRIRA provision which applied to Copeland under the transitional rules of IIRIRA. That provision, former Section 106 of the INA, stated that 'an order of deportation . . . shall not be reviewed by any court if the alien . . . has departed the United States after the issuance of the order.'" (citing 8 U.S.C. § 1105a(c) (1995))). Then, making matters precedentially more complex, there is a Sixth Circuit decision which both supports and undercuts Peters's contention. See Madrigal v. Holder, 572 F.3d 239, 245 (6th Cir. 2009) ("Unlike the cases in which the petitioner either deliberately or inadvertently left the United States, it cannot be said that Madrigal relinquished or abandoned the right to appeal by virtue of her own conduct. Instead, her departure was forced by the government

during the pendency of her appeal and, hence, she did not take any action, either purposeful or unwitting, that can be construed as a waiver of her right to contest the immigration judge's decision."). But see id. at 244 ("On its face, section 1003.4 does not distinguish between volitional and non-volitional departures. Moreover, courts that have examined the issue have rejected the notion that the regulation contains a blanket exception for involuntary departures. Indeed, to do otherwise 'would require us to read into § 1003.4 an exception that it neither expressly nor implicitly provides.' Nevertheless, our sister circuits have applied the doctrine of waiver to suggest that involuntary departures may not always be subject to the automatic withdrawal provision in section 1003.4." (internal citations omitted)).

Lack of interpretative certainty notwithstanding, Peters's position is bolstered by cases such as Brons v. Holmes. See 215 F. App'x 48, 50-51 (2d Cir. 2007) ("'[D]ue process requires that some form of notice be given directly to individuals . . . before their appeals are deemed waived pursuant to 8 C.F.R. § 1003.4 when they briefly leave the United States.'" (quoting Martinez-de Bojorquez v. Ashcroft, 365 F.3d 800, 805 (9th Cir. 2004))). To be sure, Brons concerned an alien's voluntary departure from the United States, but the absence of notice, a cardinal principle of due process, is common to both. It strongly compels the conclusion that the failure to appeal the order to deport Peters cannot be the basis used to convict him in the current case. Cf. Mendoza-Lopez, 481 U.S. at 842 ("Because respondents were deprived of their rights to appeal, and of any basis to appeal since the only relief for which they would have been eligible was not adequately explained to them, the deportation proceedings in which these events occurred may not be used to support a criminal conviction, and the dismissal of the indictments against them was therefore proper."); Fuentes-Argueta v. INS, 101 F.3d 867, 870 (2d Cir. 1996) (discussing, in the context of learning of deportation hearings, how § 242B of the INA provides

for the reopening of deportation proceedings in cases where the alien did not receive notice in accordance with subsection (a)(2) of this section).

The Court holds, as a result, that Peters's failure to exhaust his administrative remedies must be excused. Accordingly, the Court proceeds to the second prong.

## C.  Deprivation of Judicial Review

Peters argues that he was deprived of judicial review because, due to his representatives' failure to timely file the § 212(c) application, neither the IJ nor the BIA ever considered the merits of his § 212(c) waiver request in connection with the deportation order. Peters could have, of course, had sought judicial review of the 1992 final order of deportation, hollowed as it was by the absence of any consideration of the 212 waiver he was seeking, by (a) filing a petition for review in the appropriate court of appeals within 30 days of the issuance of that order or (b) seeking habeas relief in the district court once "held in custody pursuant to an order of deportation." See INA § 106(a)(1), (10), 8 U.S.C. § 1105a(a)(1), (10) (Supp. II 1990), repealed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, §§ 440(a), 401(e), 110 Stat. 1214 (Apr. 24, 1996).[5]

"Deprivation of the opportunity for judicial review can be established by demonstrating ineffective assistance of counsel, and the failure of counsel to file a § 212(c) application can constitute ineffective assistance of counsel."[6] United States v. Perez, 330 F.3d 97, 101 (2d Cir. 2003) (citing Rabiu v. INS, 41 F.3d 879, 883 (2d Cir. 1994)). "'[F]or an alien to prevail on a claim of ineffective assistance of counsel, he or she 'must show that his counsel's performance

---

[5] Prior to AEDPA, federal court of appeals had jurisdiction to hear appeals of final deportation orders. See Garay v. Slattery, 23 F.3d 744, 745 (2d Cir. 1994). With the passage of AEDPA in 1996, the superseding law "withdrew federal jurisdiction over claims brought by aliens . . . deported because of convictions for specified offenses." Jean-Baptiste v. Reno, 144 F.3d 212, 215 (2d Cir. 1998).

[6] The Second Circuit has recognized claims for ineffective assistance of counsel against "non-attorney representatives at deportation hearings." Paljusaj v. Ashcroft, No. 02-CV-4245, 2003 U.S. Dist. LEXIS 4319, at *13 n.3 (S.D.N.Y. Mar. 7, 2003) (involving a claim of ineffective assistance against Father Vitaglione (citing Arango-Aradondo v. INS, 13 F.3d 610, 614 (2d Cir. 1994))).

was so ineffective as to have impinged upon the fundamental fairness of the hearing in violation of the fifth amendment due process clause.'" Id. (quoting Saleh v. United States Dep't of Justice, 962 F.2d 234, 241 (2d Cir. 1992)). In analyzing Perez's claim under section 1326(d), the Second Circuit "held that Perez had been deprived of the opportunity for judicial review because: (a) his counsel failed to file, after stating that he would, a § 212(c) application, 'which fell below the level of performance expected of competent counsel'; and (b) Perez was thereby prejudiced because 'he had shown that he was eligible for § 212(c) relief and that he could have made a strong showing in support of his application for such relief.'" See Scott, 394 F.3d at 117; see also Rabiu, 41 F.3d at 882-83.

### 1. Failure to File § 212(c) Application

The Court is satisfied that Peters has established that he was deprived of judicial review because, as a result of his representatives' failure to timely file the § 212(c) application, neither the IJ nor the BIA ever considered the merits of his § 212(c) application. See Perez, 330 F.3d at 101. Indeed, he has satisfied both prongs of the test set forth in Rabiu, Perez, and Scott. As in Perez, Peters's representatives failed "to file the § 212(c) application after stating that [they] would . . . and without later informing [him] otherwise." 330 F.3d at 102. The Court finds that a competent representative would have filed the application and that the inaction of Father Vitaglione, and those pinch-hitting for him, were omissions that fell below the level of performance expected of a competent advocate,[7] especially when compounded by the failure to tell the IJ about Peters's affidavit of indigency or the witnesses present and available to testify.

---

[7] While it is clear from the record that Peters had not submitted supporting documentation for his § 212(c) application to Father Vitaglione by the time of deportation, it is beyond question that, but for the ineffective assistance of Father Vitaglione and his cohorts, he would have done so eventually. Having the Copeland hearing witnesses testify or send letters on Peters's behalf in 1992 would almost certainly have made a difference to the outcome of the proceedings, see Paljusaj, 2003 U.S. Dist. LEXIS 4319, at *5, and it is clear that Peters's representatives, after Smith, did nothing to bring Peters's witnesses before the IJ. And, although "[t]he regulations to apply for § 212(c) relief require only the submission of a Form I-191, Application for Advance Permission to

## 2. Resulting Prejudice: Eligibility for § 212(c) Relief

Second, Peters "has shown prejudice because he has shown that he was eligible for § 212(c) relief and that he could have made a strong showing in support of his application for such relief." Id. On May 4, 2010, the Court held an evidentiary hearing in connection with Peters's motion to dismiss the indictment. At its core, the hearing focused on the relevant § 212(c) factors, since it was the hypothetical hearing an IJ would hold before deciding a § 212(c) application on its merits, that is, which would balance the "adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented in his behalf to determine whether the granting of section 212(c) relief appears in the best interests of this country." Copeland, 376 F.3d at 73-74 (quoting In re Marin, 16 I. & N. Dec. 581, 584 (BIA 1978)). In performing this analysis, the Court endeavored to "obtain all of the facts relevant to the particular alien and then apply standards established under Section 212(c) to those facts, taking into account actual cases in which similarly situated aliens have been granted or denied discretionary relief." Copeland, 376 F.3d at 74.[8]

In Scott, the Second Circuit reminded district courts that they must view the facts as they stood at the time that a § 212(c) merits hearing should have been held, and that "ex post data" should not be considered. 394 F.3d at 118-19 (stating that "in assessing whether the defendant-

---

Return to Unrelinquished Domicile. 8 C.F.R. § 1212.3(a)," Sosa-Valenzuela v. Gonzales, 483 F.3d 1140, 1144 n.7 (10th Cir. 2007), an IJ would often request additional supporting information. See, e.g., Paljusaj, 2003 U.S. Dist. LEXIS 4319, *4; Matter of Hernandez-Casillas, 20 I. & N. Dec. 262, 263 (BIA 1990). But, Peters is correct in noting that, officially, only the I-191 (and the fee) needed to have been filed for his section 212(c) application to be finally processed.

[8] The Court notes that its task in considering whether there is a reasonable probability that a defendant would have been granted § 212(c) relief is made particularly difficult by the fact that a large percentage of "section 212(c) [decisions are] unpublished and inaccessible," thus making it almost impossible for a court reviewing cases years later to identify patterns in who was granted relief and who was denied relief. Copeland, 369 F. Supp. 2d 275, 305-08 (E.D.N.Y. 2005) (decision on remand). This difficulty is compounded by the fact that "[i]mmigration judges are human, subject to varying biases, and . . . it is inevitable that some judges would have approached their evaluations with more sympathy and compassion than others." Id. at 310. Nevertheless, what is known is that following a weighing of the above factors, "51.5% of the applications for which a final decision was reached between 1989 and 1995 were granted." INS v. St. Cyr, 533 U.S. 289, 296 n.5 (2001).

alien had a reasonable probability of not being deported at his proceeding . . . the district court should reconstruct events as they existed at the time of the disputed deportation proceedings, without considering future occurrences"). An alien's "entire criminal record" at the time that he was ordered to be deported by an IJ is therefore relevant to a district court's evaluation of prejudice, but criminal convictions arising between the order and the actual deportation are not. Id. The district court must then "play the role of prognosticator, and divine whether, had the error not occurred, the defendant would likely have obtained immigration relief." Edwards v. INS, 393 F.3d 299, 311 (2d Cir. 2004). In the instant case, the relevant date for evidence that might bear on an IJ's timely ruling upon Peters's application for § 212(c) relief is January 15, 1992, the date of the deportation order.

Substantively, critical to the Court's analysis is the BIA's 1978 delineation of both the adverse and positive factors that an IJ should weigh when considering a § 212(c) application. See Marin, 16 I. & N. Dec. at 584-85. Factors that were deemed adverse include the "nature and underlying circumstances of the exclusion ground at issue, the presence of additional significant violations of this country's immigration laws, the existence of a criminal record and, if so, its nature, recency, and seriousness, and the presence of other evidence indicative of a respondent's bad character or undesirability as a permanent resident of this country." Id. at 584. On the flip side, favorable considerations would include "family ties within this country, residence of long duration in this country, evidence of hardship to the alien and alien's family upon deportation, Armed Forces service, employment history, community service, property or business ties, evidence attesting to good character, and, in the case of one convicted of criminal conduct, proof of genuine rehabilitation." Lovell v. INS, 52 F.3d 458, 461 (2d Cir. 1995) (summarizing Marin, 16 I. & N. Dec. at 584-85).

At the hearing, Peters called as witnesses his sisters Margaret and Philomena, Margaret's daughter, his ex-girlfriend's mother (and grandmother to his son), and the mother of the victim in the homicide case in which Peters had testified for the prosecution. The government did not call any witnesses, but submitted several documents received into evidence and relied upon its cross-examination of defendant's witnesses.

With respect to adverse factors, the Court first considers the exclusion ground originally identified by the immigration authorities: Peters's 1987 and 1989 convictions for selling drugs. Immigration judges, even when they had authority to grant waivers in such circumstances, were particularly cautious about granting § 212(c) waivers to aliens convicted of drug-related offenses. See, e.g., Correa v. Thornburgh, 901 F.2d 1166, 1170 (2d Cir. 1990) (asserting that "[d]rug offenders must present a showing of unusual or outstanding countervailing equities to obtain a waiver, particularly if the grounds for exclusion involved trafficking in drugs" (citing Marin, 16 I. & N. Dec. at 586 & n.4)). It is also true, however, that courts in this circuit have found sufficient countervailing equities to establish prejudice in the cases of numerous drug offenders. See, e.g., Perez, 330 F.3d at 102 (affirming district court's finding that there was a reasonable probability that alien's significant family ties and history of steady employment in the United States would have outweighed his conviction for attempted sale of a controlled substance); United States v. Calderon, 391 F.3d 370, 376 (2d Cir. 2004) (affirming holding by Judge Weinstein that the equities favoring an alien's application for § 212(c) relief, including his family ties and lengthy residence in the United States, most likely would have outweighed his conviction for possession of a controlled substance with intent to distribute).

It appears to the Court that the then-INS's stated basis for finding Peters to be deportable—his conviction for the nonviolent, street-level sale of drugs—would likely not have

been sufficient on its own to defeat an application for § 212(c) relief in the presence of a modicum of positive factors. Historically, IJs have granted § 212(c) relief from time to time on the basis of countervailing equities even when an alien was convicted of multiple and/or violent offenses. See, e.g., In re Jose Jesus Gutierrez-Murillo, No. A13 717 602, 6 Immig. Rptr. (MB) B1-72 (BIA 1988) (granting § 212(c) waiver despite defendant's convictions for selling cocaine and for voluntary manslaughter); In re Gordon, 20 I. & N. Dec. 52, 53 (BIA 1989) (granting § 212(c) waiver despite defendant's lengthy criminal history, including convictions for robbery and receiving stolen property); In re Coelho, 20 I. & N. Dec. 464, 468 (BIA 1992) (granting § 212(c) waiver despite defendant's multiple convictions for conspiracy to possess cocaine with intent to distribute and possession of cocaine with intent to distribute); cf. Scott, 394 F.3d at 119-121 (finding that defendant would have had a reasonable probability of obtaining § 212(c) waiver despite four convictions prior to his deportation hearings: two for criminal possession of stolen property, one for grand larceny and one for unauthorized use of a vehicle); United States v. Najera-Trejo, 2006 WL 2191349, at *9-10 (E.D.N.Y. July 31, 2006) (also finding that defendant had a reasonable probability of receiving § 212(c) relief despite his plea of guilty on eight different charges stemming from a violent carjacking, including one count of robbery in the first degree).

There is no doubt, see Scott, 394 F.3d at 118 (citing Copeland, 376 F.3d at 73), that an IJ reviewing Peters's application in 1992 would certainly and appropriately have considered (adversely) his 1987 and 1988 drug-related arrests and subsequent 1989 conviction, all of which took place during his five-year term of probation and its recency to his deportation proceedings. Still, the Court finds no basis to conclude that the state of Peters's rap sheet alone would have operated as a categorical bar to a § 212(c) waiver, absent an extraordinary demonstration of

countervailing factors. Furthermore, as discussed below, his application would have presented at least one extraordinary factor in his favor.

But first, there is an additional negative factor beyond the convictions and the substantial absence of countervailing positive factors not related to defendant's family life.[9] The additional negative factor, and clearly not a major one, is that Peters used at least one alias, "Paul Adams," which, apparently, he gave to the authorities upon his third arrest. (See, e.g., Tr. at 24.)

This is not to say that the other side of the ledger is blank. The Court now turns to the "social and humane factors" that would have weighed in favor of Peters's § 212(c) application as of January 1992. Peters entered the United States as a legal resident in 1981, and lived here until he was deported in 1995. As a result, he would have been a legal resident continuously for approximately 11 years in 1992. He had then, and continues to have now, significant extended family ties to this country. In 1992, to be specific, many of his relatives were living in New York City, including his sister Margaret, with whom he was residing in January 1992. (See, e.g., Tr. at 17-18.)

At the hypothetical hearing, family members provided, as they would have at an actual hearing had it been held, moving and credible testimony attesting to Peters's good character and the mutual loving relationship with his family. (See, e.g., Tr. at 6, 30, 42, 47-48, 58, 62, 64). His sister Philomena and his niece testified that he was an important member of their family and that it was important to each of them to have him present in their lives. (Tr. at 47-48, 58.) Peters's sisters and niece, as well as his ex-girlfriend's mother and the mother of the victim in the homicide Peters had witnessed, testified that they would have testified on his behalf at a § 212 waiver hearing, had they been asked. (Tr. at 16, 47, 58-59, 64, 71; see also Tr. at 65.)

---

[9] The Court notes that, by all accounts, Peters has never performed any traditional community service, served in the Armed Forces, or developed any discernable property or business ties to the United States. (See, e.g., Tr. at 29-30, 56.)

His sister Margaret testified that Peters changed after the 1984 death of their mother, with whom he had only recently been reunited following several years of geographical separation. (See Tr. at 5-6, 10.) Specifically, she testified that he became "withdrawn" and "wouldn't come home some days", (Tr. at 11); she indicated that his drug use began following their mother's death. (See Tr. at 11-12.) His sister Philomena confirmed that "I think [their mother's death hit him] because when we came, we didn't get to spend a lot of time with our mom before she passed." (Tr. at 45; see also Tr. at 51.) His sisters and his ex-girlfriend's mother testified that Peters was not violent. (See Tr. at 12, 48, 63-64.) Further, during his state incarceration, Peters received multiple certificates of achievement and participated in educational, rehabilitation, and vocational programs. (Defense Exhibits T-Y.)

And there is more. As of the record date, January 15, 1992, Peters had at least two American-born, biological children, Leon and Tiffany, for whom he provided financial and emotional support, (Tr. at 10, 34-35, 44-45, 63; see also Tr. at 53-54); he also provided financial and emotional support to Leon's half-sister, Latoya, whom Peters treated like his own child, and financial support to Leon's and Latoya's mother. (See Tr. at 9-10, 39, 63.) Peters also helped Margaret and Philomena with their respective children. (See Tr. at 30, 47-48, 58.) Margaret's daughter testified at the hypothetical hearing: "Mr. Peters was not my uncle, he was more like my father because I didn't grow up with my father. As I was growing up, I wasn't the most perfect child. I went to Family Court. Uncle Mark was basically the person that signed the paper there, took me to counseling and basically tried to keep me out of trouble." (Tr. at 58.) She affirmed that, in 1992, "it [was] important to [her] that he be allowed to stay in this country." (Id.)

17

The evidence developed Peters's role as a financial contributor to family life. He held various jobs at local businesses. (See, e.g., Tr. at 8, 21-23, 49, 52, 54.) From his earnings, Peters was able to contribute $100 to $300 a month to the extended family's household expenses. (Tr. at 21, 43, 49; see also Tr. at 9.) He also paid income tax on his earnings. (See, e.g., Tr. at 54-55. But see Tr. at 30.)

Perhaps most significant is the existence of the extraordinary factor; it sets this case aside from the run of the mill. Peters, it is unchallenged, participated as a witness and voluntarily cooperated in a homicide prosecution that led to conviction and closure for the victim's family. (See, e.g., Tr. at 13, 49, 64, 70-71.) The evidence is also clear and convincing that if an actual § 212 waiver hearing had been held in 1992 that the Deputy Chief of Homicide in the Queens District Attorney's Office was willing to testify before the IJ on Peters's behalf and did write letters to the then INS attorney on Peters's behalf. Given the very close call presented by a case such as this, the fact that a significant official in the office of the Queens County District Attorney would go to bat for a convicted drug dealer with the record Peters had in an effort to help him remain not only in the United States but almost certainly in Queens County, is the extraordinary factor that tips the balance in defendant's favor.

Based on the totality of the evidence presented at or incorporated into the record of the Copeland hearing held before this Court, there is a reasonable probability, the Court finds, that Peters would have been granted relief under § 212(c) by an IJ considering his § 212(c) waiver request on its merits in 1992. The positive factors supporting his § 212(c) application—for example, Peters's many years of residency in the United States, the presence here of a close-knit extended family for whom Peters provided financial and other support, and, most critically, his voluntary cooperation in a homicide prosecution—would have outweighed his violations of the

18

drug laws and the absence of other positive factors. Stated differently, given these facts, an IJ

would likely have found that the granting of § 212(c) relief to Peters in 1992 would serve "'the

best interests of this country.'" United States v. Cerna, 603 F.3d 32, 41 (2d Cir. 2010) (quoting

Scott, 394 F.3d at 119). Since Peters can demonstrate both a failure to file a § 212(c) application

and the requisite prejudice, he successfully establishes both prongs set forth in Perez for a

successful ineffective assistance of counsel claim.[10]

The Court therefore concludes that Peters has satisfied the second prong and met his

burden of showing that "the deportation proceedings at which the [deportation] order was issued

improperly deprived [him] of the opportunity for judicial review," 8 U.S.C. § 1326(d)(2). As

such, we now turn to consideration of whether "entry of the [deportation] order was

fundamentally unfair." 8 U.S.C. § 1326(d)(3).[11]

## D.    Fundamental Unfairness

To establish "fundamental unfairness" under § 1326(d)(3), an alien "must show both a

fundamental procedural error and prejudice resulting from that error." Fernandez-Antonia, 278

F.3d at 159. In finding here that Peters was deprived of the opportunity for judicial review, see

supra Part II.C, the Court concluded "that he had shown that he had been deprived of effective

---

[10] The Court finds that, even if Peters had not received the ineffective assistance of counsel, any waiver of his right
to appeal was neither considered nor intelligent. Indeed, he and his sister could not get in touch with Father
Vitaglione to find out what had happened at the hearing—let alone to find out that he had been ordered deported.
The Court does not find that Peters's "waiver" of appeal during that brief, 30-day period, could have been
considered or intelligent. The Court also finds that seeking habeas relief when ultimately in INS custody would not
have been a meaningful form of judicial review because any habeas petition would have been rejected while his
motion to reopen was pending. See Copeland, 376 F.3d at 69 n.7 ("'[A]n order of deportation or exclusion shall not
be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right
under the immigration laws and regulations.'" (quoting 8 U.S.C.S § 1105a(c) (1995))); id. at 68 ("[W]here habeas
review is technically available, judicial review will be deemed to have been denied if resort to a habeas proceeding
was not realistically possible"). For that matter, filing a petition for habeas corpus between October of 1995 (when
he was held in custody pursuant to the order of deportation) and November 25, 1995 (the day that he was deported)
would have been nearly impossible.

[11] The Court's conclusion in Part II.A, supra, is not at odds with its conclusion in Part II.B. See Sosa, 387 F.3d at
136 ("There was almost certainly no administrative exhaustion in Mendoza-Lopez itself, yet the Court held that
collateral review of the underlying deportation order was constitutionally required." (citing Mendoza-Lopez, 481
U.S. at 830)); and Copeland, 376 F.3d at 68-69 ("[A]n alien's failure to seek [habeas] review will not be deemed to
preclude a collateral attack on a deportation order under Section 1326(d)(2).").

assistance of counsel (i.e., that a fundamental procedural error had occurred) and that prejudice had resulted because he was eligible for § 212(c) relief and could have made a strong showing in support of such relief. Accordingly, Peters has satisfied the 'fundamental unfairness' requirement," see Perez, 330 F.3d at 104, and succeeds at the third and final prong. All three have been satisfied.

### III. CONCLUSION

In sum, the Court finds that defendant Joseph Mark Delevante Peters has satisfied all three prongs of 8 U.S.C. § 1326(d) by establishing that he exhausted his administrative remedies, was denied his opportunity for judicial review, and that the entry of the deportation order against him was fundamentally unfair. As a result, the underlying deportation order violated his due process rights and cannot be the basis for the essential element of prior deportation which lies at the root of the pending illegal reentry charge. The Court must, consequently, grant defendant's motion. The indictment charging the defendant with illegal reentry in violation of 8 U.S.C. §§ 1326(a) and 1326(b)(2) is dismissed with prejudice.

**SO ORDERED.**

DATED:      Brooklyn, New York
              October 28, 2010

                                              _____
                                              ERIC N. VITALIANO
                                            United States District Judge